| | |
|---|---|
| **Law Offices of Avrum J. Rosen, PLLC** | **Hearing Date: March 6, 2024** |
| 38 New Street | **Hearing Time: 10:00 am** |
| Huntington, New York 11743 | |
| (631) 423-8527 | |
| Avrum J. Rosen, Esq. | |
| Alex E. Tsionis, Esq. | |

*Proposed Attorneys for. Borohub Gardens LLC,*
*Debtor and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:                                                                    Chapter 11

     Borohub Gardens LLC,                            Case No. 23-44469-jmm
                               Debtor.
-----------------------------------------------------------x

### APPLICATION FOR LEAVE TO EMPLOY THE LAW OFFICES OF AVRUM J. ROSEN, PLLC AS ATTORNEYS FOR THE DEBTOR AND DEBTOR IN POSSESSION, EFFECTIVE AS OF JANUARY 26, 2024, AND TO PERMIT THE PAYMENT OF A POST-PETITION RETAINER

**TO:   THE HONORABLE ELIZABETH S. STONG**
         **UNITED STATES BANKRUPTCY JUDGE**

Borohub Gardens LLC., the debtor and debtor in possession (the "Debtor"), respectfully submits this as and for its application (the "Application") seeking the entry of an order retaining the Law Offices of Avrum J. Rosen, PLLC ("AJR"), as attorneys for the Debtor, effective as of January 26, 2024, under sections 105, 327 and 328 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 2014 of the Federal Rules of Bankruptcy Procedure, and the E.D.N.Y. Local Bankruptcy Rules, and to permit the payment of a post-petition retainer by the Debtor in the amount of $20,000.00. In the support of the Application, the Debtor submits and incorporates herein the affidavit of Avrum J. Rosen, Esq., a member of AJR. In further support of this Application, the Debtor respectfully represents as follows:

      1.     On December 4, 2023 (the "Petition Date"), the Debtor filed a *pro* se voluntary petition for relief under Chapter 11 of the Bankruptcy Code. *See* Dkt. No. 1.

2.   The reason for the filing was a discovery by the former Managing Member of the Debtor that a purported UCC sale of the equity interests in the Debtor was scheduled to take place on December 5, 2023. That creditor is DM Investors LLC ("DM"), who appears to be represented by David Stevens, Esq.  DM proceeded with the sale on the day after the petition was filed, even though they had notice of the bankruptcy filing.

3.   Any argument that the sale of the members' interests did not violate the automatic stay is controverted by DM's own actions.  DM filed UCC-1 liens indexed against the Property on ACRIS.  Copies of those filings are annexed hereto as **Exhibit "A".**  In addition, DW caused to be filed on ACRIS a Declaration of Restrictions, which required its consent to any further encumbrances on the Property.  A copy of that document is annexed hereto as **Exhibit "B".**  To understand what happened here, the genesis of this loan needs to be explained.  Borohub owned the Property previously, with different members, but including Shlomo Epstein ("Epstein").  There were several deed transfers, The ACRIS record is annexed hereto as **Exhibit "C".** Eventually, Shlomo Epstein owned the Property in his own name and had and has a first mortgage with       , which has never been notified of this filing and which the Rule 1007 affidavit filed by intentionally omits.

4.   DW had previously loaned Epstein $160,000.00. On December 24th, 2018, a closing took place Between DM and Epstein and Jacob Richter ("Richter") as borrowers, at which neither of them were represented by counsel. The transfer appears to have violated the due on sale provisions of the first mortgage.  The entire closing binder prepared by DM's counsel is annexed hereto as **Exhibit "D".**  All of the documents to be discussed are part of that Exhibit. At that closing DM's counsel prepared the deed into the Debtor (he is the counsel on the Record and

Return portion of the deed). The Closing Statement shows the amounts previously advanced. The Pledge and Security Agreement refers to an Operating Agreement dated December ___, 2018.

5. That same document refers to certificated membership interests. The problem is that none of those documents appear to exist. The table of contents for the Closing Statement does not include either item and the Debtor has no record of having received them. Exhibit "D" is all they received from the closing. As a result, DM has a security interest in nothing. N.Y. Ltd. Liab. Co. Law § 603(b) (Consol., Lexis Advance through 2023 released Chapters 1-774). That is why none of the support for their "ownership" was put before this Court. Moreover, a review of that document shows that DM, to the extent it received a security interest, only had a pledge of the economic interests of the member. Nothing in that Pledge Agreement gave DM an interest in the management or the voting rights of the members. Moreover, pursuant to applicable New York State law, the assignment of a membership interest transfers none of the management rights. N.Y. Ltd. Liab. Co. Law § 603(a) (Consol., Lexis Advance through 2023 released Chapters 1-774). Against this backdrop, what transpired when a default was allegedly called will be examined.

6. Mr. Stevens sent a letter to the Court [Dkt. No. 4] stating that his client now owned the equity in the Debtor and was ratifying the filing of the case and he would be moving to be retained as counsel. A status conference took place on January 10, 2024 which was further adjourned to February 14, 2024. A retention application was filed [Dkt. No. 9], but does not appear to have been noticed for any determination.

7. This firm was contacted by Epstein, the actual managing member of the Debtor, and the undersigned conducted an investigation into the purported UCC sale of the membership interests in the Debtor and violations of the automatic stay. As will be set forth below, it is clear that no proper sale ever took place and Mr. Epstein was and is the sole member of the Debtor.

Moreover, since the Debtor was also effectively a party to the loan agreement with DM, the automatic stay prevented and prevents DM from taking any action against the Debtor and all of the actions taken so far in this case were not properly authorized.

8. As a threshold issue, there was no enforceable UCC sale. Annexed hereto as **Exhibit "E"** is a purported "Notice of Our Plan to Sell Property" from the law firm of Avram E. Frisch, LLC. This firm was unknown to the recipients of this letter. They had never dealt with him before in regards to this entity or DM and DM never sent them any communication to establish his agency to call a default. In *In re Royal Yarn Dyeing Corp.*, 114 B.R. 852, 860 (Bankr. E.D.N.Y. 1990), then-Chief Judge Duberstein stated that, "It is hornbook law of agency that 'the agent's' authority may not be proven out of the mouth of the agent." *Whitefriars East Co. v. Labyrinth Data Processing Enterprises Ltd.,* 132 Misc. 2d 668, 504 N.Y.S.2d 1010, 1011 (N.Y. Civ. Ct. 1986); s*ee also Granet Construction Corp. v. Longo,* 42 Misc. 2d 798, 249 N.Y.S.2d 231 (N.Y. Sup. Ct. 1964) (Attorney's notice held insufficient to terminate lease). Furthermore, "the acts of a person assuming to be the representative of another are not competent to prove the agency in the absence of evidence tending to show the principal's knowledge of such act or assent to them." 2 N.Y. Jur.2d. "Agency and Independent Contractors" Para. 26. "Therefore, the statement of the signer of the notice that he is the attorney for the landlord is inadequate." *In re Royal Yarn Dyeing Corp.*, 114 B.R. at 860.

9. In *Siegel v. Ky. Fried Chicken, Inc.*, 67 N.Y.2d 792, 501 N.Y.S.2d 317, 492 N.E.2d 390 (1986), the New York Court of Appeals applied that doctrine in the landlord/tenant context and held that "Under such a lease notices of default and of termination signed not by the owner or the attorney named in the lease, but by another attorney with whom the tenant had never previously dealt, were insufficient and the tenant was entitled to ignore them as not in compliance with the

4

lease provisions concerning notice (*cf. Mann Theatres Corp. v Mid-Island Shopping Plaza Co*., 94 AD2d 466, 474; *see, Reeder v Sayre,* 70 NY 180, 188)."

10. In the mortgage foreclosure context, New York State courts have applied the same standard. For example, in *Mfrs. & Traders Tr. Co. v. Korngold*, 162 Misc. 2d 669, 618 N.Y.S.2d 744 (Sup. Ct. Rockland Cty, 1994), a mortgagee sought to foreclose on property occupied by mortgagors. *Id* at 670. The mortgagors responded that they never received proper notice of default from the mortgagee. *Id*. Rather, the mortgagors received a notice from a mortgage company who claimed it was the mortgagee's agent. *Id*. The mortgagee claimed that the notice from its "agent" was adequate and filed a motion for summary judgment. *Id.* The court disagreed and denied the motion. *Id.* at 699. The court held that where a lease required a notice of default to be sent by the "landlord," any notice sent by the landlord's agent was ineffective unless accompanied by proof of the agent's authority to bind the landlord. *Id.* at 670-71. Using this reasoning, the court found that the mortgagors were never notified that the mortgage company was the mortgagee's agent. *Id.* at 671. Thus, without the proper notice, the court held that the mortgagee was not entitled to foreclosure. *Id*.; s*ee also Bank of N.Y. Mellon v. Deane*, 2013 NY Slip Op 23224, 41 Misc. 3d 494, 970 N.Y.S.2d 427 (Sup. Ct. Kings Cty. 2013) (bank not entitled to summary judgment in a foreclosure action because, among other things, the notice of default was given by an entity that was not the "Lender," nor shown to have been identified to the mortgagors as authorized to act for the lender); *see also EMC Mortg. Corp. v. Suarez*, 2008 NY Slip Op 2102, 49 A.D.3d 592, 852 N.Y.S.2d 791 (App. Div. 2nd Dept.); *see also Cadlerock Joint Venture, L.P. v. MacPherson*, 2013 N.Y. Slip Op. 31991 (N.Y. Sup. Ct. 2013) (court denied mortgagee's motion for summary judgment because notice of default was sent by mortgagee's servicing agent in contravention of the loan documents).

11. "When a party sends a default notice pursuant to the provisions of a contract such as a note or mortgage, it must strictly comply with those provisions." *Cadlerock Joint Venture, L.P. v. MacPherson*, 2013 N.Y. Slip Op. 31991 (N.Y. Sup. Ct. 2013); *see also Graf v. Hope Bldg. Corp.*, 254 N.Y. 1, 4, 171 N.E. 884, 885 (1930) ("Stability of contract obligations must not be undermined by judicial sympathy").

12. Federal courts have been uniform in applying this holding in both lease and foreclosure contexts. For instance, in *In re Sheba Realty Corp.*, No. 12-75455-dte, 2014 Bankr. LEXIS 1282 (Bankr. E.D.N.Y. Mar. 27, 2014), the court was faced with the identical procedural context and very similar facts. In that case, the default notices were sent to the wrong address. *Id.* at *9. In the interim, the debtor had cured the monetary defaults alleged in the default notices. *Id.* The court held that the defective default notices did not accelerate the mortgage where a written notice of default and opportunity to cure was in the loan documents. *Id* at *31. As a result, the lender was not entitled to default rate interest and the loan could be reinstated. *Id.* In addition, that court held that because the loan was not properly accelerated any late fees were also disallowed. *Id.* at *32.. There is no legal or logical reason why this rule should not apply in a UCC sale.

13. On top of that deficiency, the "Notice" is undated, so it is impossible to determine when it was sent. Last but not least, the "Notice" sets a date and time for the alleged sale, but did not include the location. There is no second page to the correspondence except for a service list, and it was not even signed. The undersigned was incredulous that any lawyer would rely upon such a document to seize control of a building. However, annexed hereto as **Exhibit "F"** is a copy of the letter the same attorney sent to the tenants of the Property. It has the same deficiencies as to basic agency law and acknowledges the existence of the pending chapter 11 case, with no concerns as to the applicability of the automatic stay.

14. The undersigned thought there had to be more to this attempted sale and did a Google search of the debtor and all of the parties. Annexed hereto as **Exhibit "G"** is the notice of sale that was posted in the New York Law Journal. This Notice was issued by the attorney that represented DM in the transaction. The problem with this notice is that it was published on November 27, 2023 and set the sale, at a completely different location, for December 5, 2023. In other words, the notice provided was only eight (8) days' notice and is deficient as a matter of law, because the New Yort UCC Section 9-612 requires at least ten (10) days' notice before any disposition of any collateral.[1] The Debtor reserves its rights pursuant to UCC Section 9-625 to seek damages for this defective purported sale;

REMEDIES FOR SECURED PARTY'S FAILURE TO COMPLY WITH ARTICLE.

(b) [Damages for noncompliance.] Subject to subsections (c), (d), and (f), a person is liable for damages in the amount of any loss caused by a failure to comply with this article. Loss caused by a failure to comply may include loss resulting from the debtor's inability to obtain, or increased costs of, alternative financing.

15. Thus, it is evident that DW has blatantly violated the automatic stay by seizing the property and asserting that is in control of the Debtor. Moreover, Epstein also ratifies this filing and asserts that it is the Party in control of the Debtor and the Debtor requires its own attorney to be retained in this case. The Debtor is not sufficiently familiar with the rights and duties of a

---

[1] § 9-612. TIMELINESS OF NOTIFICATION BEFORE DISPOSITION OF COLLATERAL.
(a) [Reasonable time is question of fact.]

Except as otherwise provided in subsection (b), whether a notification is sent within a reasonable time is a question of fact.

(b) [10-day period sufficient in non-consumer transaction.]

In a transaction other than a consumer transaction, a notification of disposition sent after default and 10 days or more before the earliest time of disposition set forth in the notification is sent within a reasonable time before the disposition.

debtor in possession so as to be able to plan and conduct proceedings in Chapter 11 without the aid of competent Chapter 11 counsel.

16. The Debtor has made diligent inquiry into the qualifications of AJR, and is advised that members of AJR are admitted to practice before this Court and by reason, ability, integrity and professional experience, are capable of providing proper legal counsel to the Debtor. AJR and the undersigned have no connection with any creditor or interested party herein and represent no interest adverse to the estate or to the Debtor.

17. The Debtor has engaged the services of AJR as attorneys for the Debtor and has engaged AJR to perform services as attorneys for the Debtor subject to the approval of this Court. AJR will advise the Debtor of the rights and duties of a debtor in possession, will oversee preparation of necessary reports to the Court or creditors, will conduct all appropriate investigation or litigation and will perform any other necessary duty in aid of the administration of the estate.

18. The Debtor believes that AJR is disinterested, as that term is defined in section 101(14) of the Bankruptcy Code since AJR:

(a) is not a creditor, equity security holder or insider;

(b) the Debtor's shares are not publicly traded and no investment banker has been employed for the Debtor;

(c) is not and its member has never been officers, directors or employees of the Debtor or any investment banker; and

(d) does not have any interest materially adverse to the interest of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtor.

19. Compensation will be paid to AJR at the customary hourly rate as counsel to the Debtor from the Debtor's estate, only upon proper application to this Court thereof. AJR's current billing rates are as follows:

        Partner:              Up to $670.00 per hour;

        Associates:          Up to $570.00 per hour; and

        Paraprofessional:    Up to $200.00 per hour.

20. Subject to the Court's approval, the Debtor entered into a retainer agreement with AJR whereby the Debtor agreed to remit the sum of $20,000.00 to AJR representing AJR's initial retainer in this case..

21. The $20,000.00, has been remitted by the Debtor, will be held in AJR's escrow account, subject to an order of this Court authorizing the Debtor to retain AJR as its counsel and authorizing AJR to accept the entry of a post-petition retainer from the Debtor. The circumstances of this case warrant authorization of a post-petition retainer under the factors established by *In re Troung*, 259 B.R. 264 (Bankr. D.N.J. 2001).

22. In *Troung*, the debtors initially filed a *pro se* Chapter 13 bankruptcy case on July 20, 2000. *Id*. at 265. Approximately one (1) month later, the Debtor converted its Chapter 13 bankruptcy case to one under Chapter 11 of the Bankruptcy Code. *Id*. at 266. Shortly after, the debtors filed an application to retain bankruptcy counsel and to pay the firm a post-petition retainer of $15,000. *Id*. The Office of the United States Trustee filed a limited objection to the payment of a post-petition retainer. *Id*.

23. In finding that the post-petition retainer was reasonable in *Troung,* the United States Bankruptcy Court for the District of New Jersey, which is not binding precedent on this Court,

acknowledged the factors enumerated by *In re Knudsen Corporation*, 84 B.R. 668 (B.A.P. 9th Cir. 1988)[2] and also considered the following factors:

    i.    The retainer's economic impact on the debtor's ongoing business operation;

    ii.    The retainer's economic impact on the debtor's ability to reorganize;

    iii.    The amount and reasonableness of the retainer;

    iv.    The reputation of debtor's counsel; and

    v.    The ability of debtor's counsel to disgorge such payments at the conclusion of the case should the Court determine that the fees paid to counsel are not justified.

*Troung,* 259 B.R. at 268.[3]

24.    Turning to the factors in *Troung*, factors one through four are applicable and the instant case meets the burden of those factors.

*The Retainer's Economic Impact on the Debtor's Ongoing Business Operation*

25.    With respect to the first factor, the retainer will not have an impact on the Debtor's ongoing business operations because the Debtor is operating and generating revenue, and to the extent required, Epstein will infuse funds into the Debtor's estate.

*The Retainer's Economic Impact on the Debtor's Ability to Reorganize*

26.    Turning to the second factor, the Debtor will gain the advice and guidance of competent Chapter 11 counsel, which will increase its prospect of reorganization. The work done by AJR in determining the many issues in this case demonstrates that this Debtor needs competent counsel. AJR has already advised the undersigned as to many aspects of the Chapter 11 process,

---

[2] *Knudsen* is not binding precedent on this Court.

[3] In *Knudsen*, the court applied the following factors "(1) the case is an unusually large one in which an exceptionally large amount of fees accrue each month; (2) The court is convinced that waiting an extended period for payment would place an undue hardship on counsel; (3) The court is satisfied that counsel can respond to any subsequent court disallowance of the fees already paid; and (4) The fee retainer procedure is, itself, the subject of a noticed hearing prior to any payment thereunder" to authorize payment to professionals without court approval. The Debtor is not seeking to authorize payment to professionals without Court approval. Thus, the factors in *Knudsen* are not applicable.

which the undersigned was unaware of as well as the necessary steps to bring the case in line with the provisions of Chapter 11 of the Bankruptcy Code.

*The Amount and Reasonableness of the Retainer*

27. The specific amount of the retainer ($20,000.00) is not extraordinary when balanced against the services which must be rendered, or compared to what other competent bankruptcy counsel would accept in this similar situation. Although this Chapter 11 bankruptcy case is not particularly large, it has a level of complexity that demands experienced bankruptcy counsel. As such, this factor militates in favor of granting a post-petition retainer.

*The Reputation of Debtor's Counsel*

28. AJR and its managing member, Avrum J. Rosen, Esq., have represented Chapter 11 debtors since 1988 and confirms or resolves an overwhelming proportion of the cases it files or appears in. This Court is familiar with the work AJR performs and may take judicial notice of those cases in which AJR appears in.

29. To the best of the Debtor's knowledge, the attorneys at AJR have no connection with the Debtor, its members, or any other party in interest or their respective attorneys.

30. To the best of the Debtor's knowledge, AJR represents no interest adverse to the Debtor or to the estate in the matter in which it is to be engaged herein, and its employment would be in the best interests of the estate.

31. The Debtor requests AJR's retention to be effective as of November 2, 2023, when a detailed review of the Debtor's case commenced.

32. No prior application for the relief requested herein has been made to this or any other Court.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order: (i) approving and authorizing the employment of AJR as attorneys for the Debtor effective as of January 26, 2024; (ii) permitting the payment of a post-petition retainer to AJR in the amount of $20,000.00; together with (iii) such other, further and different relief as this Court may deem just, proper and equitable.

Dated: February 2, 2024
      Richmond Hill, New York                Respectfully submitted,

                                                       _*s/Shlomo Epstein*_____
                                                       Shlomo Epstein, Managing Member